## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GEORGE RUNKLE,                          :
                                        :
                    Plaintiff,          :      Civil Action No.:      04-0714 (RMU)
                                        :
          v.                            :      Document No.:          18
                                        :
ALBERTO GONZALES *et al.*,              :
                                        :
                    Defendants.         :

### MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART THE DEFENDANTS' MOTION TO DISMISS

### I.   INTRODUCTION

This matter comes before the court on the defendants' motion to dismiss.[1]  The

---

[1]     Numerous exhibits are attached to the defendants' motion to dismiss and the plaintiff's opposition to the defendants' motion to dismiss.  The court is mindful that the plaintiff, although attaching several exhibits, does not wish to convert the motion to dismiss into one for summary judgment under Federal Rule of Civil Procedure 56.  *See* Pl.'s Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n") at 6; *see also* FED. R. CIV. P. 12(b) (providing that a court treat a motion to dismiss for failure to state a claim as one for summary judgment when matters outside the pleading are presented to and not excluded by the court).  Accordingly, the court will not convert the defendants' Rule 12(b)(6) motion into one for summary judgment. The court can, however, consider documents that are referred to in the amended complaint and central to the plaintiff's claim without converting the motion into one for summary judgment.  *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999).  Thus, in this memorandum opinion, the court relies on six documents referred in and central to the plaintiff's amended complaint without converting the motion into one for summary judgment: the three administrative charges the plaintiff filed, Pl.'s Opp'n Ex. 2, 3, 4; the May 29, 2001 letter from the Adjudication Unit of the FBI's Office of Professional Responsibility ("FBI-OPR") finding that the plaintiff's conduct toward two coworkers violated FBI policies (the "Findings Letter"), Defs.' Mot to Dismiss ("Defs.' Mot."), Ex. 10; the November 15, 2003 letter from the Federal Bureau of Investigation's ("FBI") Administrative Services Division ordering the plaintiff to cease and desist from re-raising old, unsubstantiated allegations against coworkers (the "Farrar Letter"), *id.*, Ex. 6; and the defendant Mark Bullock's December 8, 2003 sworn statement provided as part of the investigation into the plaintiff's third administrative charge, *id.*, Ex. 8.

defendants urge the court to dismiss each of the plaintiff's eight counts in his amended complaint for either a failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) or for lack of subject jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  For the reasons discussed in this memorandum opinion, the court grants the defendants' motion to dismiss for failure to state a claim as to Counts I-IV, wherein plaintiff alleges sex and reprisal discrimination in violation of Title VII of the Civil Rights Act of 1964.  The court also grants the defendants' motion to dismiss for lack of subject matter jurisdiction as to Count VI, which alleges a violation of the Whistleblower Protection Act; Count VII, which sets forth the plaintiff's allegation of his First Amendment right to free speech violation; and to the portion of Count VIII alleging a violation of the Health Insurance Portability and Accountability Act.  The court denies the defendants' motion to dismiss for failure to state a claim as to Count V, in which the plaintiff alleges he endured a hostile work environment in violation of Title VII, and lastly, the court declines to dismiss the portion of Count VIII alleging a violation of the Privacy Act.

## II.    BACKGROUND

The facts of this case are complex, spanning several years and involving many actors. For simplification, the court summarizes the facts in this section and revisits them in more detail when necessary to fully develop its analysis.

The plaintiff, a Supervisory Special Agent with the Federal Bureau of Investigation ("FBI"), began suffering from obsessive-compulsive disorder ("OCD") and depression sometime in April 1997.  By March 1999, the plaintiff had successfully dealt with his OCD and depression challenges.  Am. Compl. ¶ 27.

On June 12, 2001, the plaintiff filed the first of three administrative charges against his employer. *Id.* ¶ 29.   In this first charge, the plaintiff alleged that he was discriminated against based on his sex in three ways.  First, he claimed that the May 29, 2001 letter (the "Findings Letter") from the Adjudication Unit of the FBI's Office of Professional Responsibility ("FBI-OPR") setting forth findings that his conduct toward two coworkers violated FBI policies demonstrated that (1) allegations he made concerning a female FBI employee were not referred to FBI-OPR for investigation and (2) allegations he submitted to FBI-OPR were not accepted for investigation.[2] *Id.* ¶ 29a.  Second, he alleged that his supervisors promised him a permanent assignment, but that as of July 30, 2001, they had not given him that assignment. *Id.* ¶ 29b. Third, he alleged that when two female FBI employees, Supervisory Special Agent Terri Royster and Special Agent Rebecca Granger, made allegations against him, those allegations were investigated, while his allegations against those agents were not investigated. *Id.* ¶¶ 29c, 54c. The FBI determined that the plaintiff had not suffered discrimination and dismissed the charge. The plaintiff appealed this decision to the Equal Employment Opportunity Commission ("EEOC"), which rejected the appeal on March 25, 2004. *Id.* ¶ 30.

On September 12, 2002, the plaintiff filed his second administrative charge.  This time he alleged sex discrimination and discrimination based on reprisal for his having filed the first administrative charge. *Id.* ¶ 34.  He alleged five bases for this charge.  First, he reiterated the allegation from his first administrative charge that FBI-OPR investigated Royster and Granger's

---

[2]     The plaintiff, throughout his amended complaint, usually does not specify the nature of various allegations made against him and by him, or whom the allegations involve.  After examination of the exhibits the court has concluded it can rely on, however, the court was able to decipher most of the plaintiff's allegations and the individuals involved.

allegations but ignored his allegations against them.  He added, however, that FBI employee Barbara Branham should be investigated for allegedly copying a postcard addressed to him and forwarding that copy to FBI-OPR.[3]  *Id.* ¶ 34a.  Second, the plaintiff alleged that on September 22, 1999, Assistant FBI Director Jeffrey Higginbotham filed charges against him that were made by a female FBI agent, but that Higginbotham did not file charges that the plaintiff had made against a male agent, even after the plaintiff had discussed those charges with Higginbotham.  *Id.* ¶ 34b.  Third, the plaintiff alleged that although he had been required to sign a "no-contact" agreement on September 24, 1999, after a female employee had complained about him, employees whom the plaintiff had complained about where not required to sign similar agreements.  *Id.* ¶ 34c.  Fourth, the plaintiff alleged that FBI-OPR opened another investigation against him (the first having resulted in the Findings Letter) based on allegations made by FBI Deputy Assistant Director Thomas Locke in May 2002; Locke, the plaintiff claimed, was motivated by reprisal for being made to provide a sworn statement during the investigation of the plaintiff's first administrative charge.[4]  *Id.* ¶ 34d.  Fifth, the plaintiff alleged that John Louden, former Acting FBI Assistant Director and Former Section Chief of the FBI's Training Division, had recommended that disciplinary action be taken against the plaintiff on unspecified "prohibited motives."  *Id.* ¶ 34e.  The FBI dismissed the plaintiff's second administrative charge,

---

[3]     According to the plaintiff, in October 2000, FBI-OPR Unit Chief John Roberts and FBI-OPR Investigator William Woerner allowed Branham to intercept the postcard, which the plaintiff alleged could cast him in "a negative light."  Am. Compl. ¶ 33.

[4]     FBI-OPR investigated Locke's allegations against the plaintiff, as well as an additional charge that the plaintiff had misused an agency computer, and dismissed those allegations in April 2003.  The plaintiff alleges that he suffered stress, humiliation, and decreased credibility within the FBI at being subject to investigation for "groundless allegations" for eleven months.  *Id.* ¶¶ 35-36.

and, again, the EEOC denied the plaintiff's appeal, on March 17, 2004.  *Id.* ¶ 37.

Meanwhile, the plaintiff began raising complaints about a perceived threat to his personal safety on the job.  Specifically, in April 2002, he reported to the FBI Director's Office, through the FBI ombudsman,[5] that he was concerned for his safety whenever he had to be at the FBI Training Academy in Quantico, Virginia because of "implicit threats" of "physical confrontations with armed agents" working there.  *Id.* ¶ 32.  In June 2002, he reported the same safety concerns to the FBI Administrative Services Division, and then again in October 2004 to Grant Ashley, Assistant Director of the FBI's Criminal Investigation Division.  Ashley was part of the plaintiff's chain of command.  *Id.* ¶ 38.

Following these disclosures, the plaintiff received a letter dated November 15, 2002 (the "Farrar Letter"), from defendant Sheri Farrar, Former Assistant Director of the FBI.  The letter, according to the plaintiff, ordered him to stop pursuing the safety concerns he had been raising or face punishment.  *Id.* ¶ 38a.  Defendant Mark Bullock, Former FBI Deputy Assistant Director and Former Assistant Director, delivered the letter to the plaintiff and admonished him to comply with it.  *Id.* ¶ 38b.  In late July 2003, defendant Robert Jordan, Former Assistant Director of FBI-OPR, suspended the plaintiff for seven days for allegedly violating the provisions of the Farrar Letter.  *Id.* ¶ 38c.  FBI Assistant Director, Steve McCraw, denied the plaintiff's appeal of his suspension and told the plaintiff to comply with the letter.  *Id.* ¶ 38d.  The plaintiff then reported to the Department of Justice's Inspector General's office, on four separate occasions, that

---

[5]     The FBI's ombudsman holds an executive-level position within the Office of the Director and offers "confidential, impartial assistance to employees experiencing workplace problems" and is "available to answer questions, to provide coaching and referrals, and to simply listen."  *About Us: FBI Executives*, *at* http://www.fbi.gov/libref/executives/zeigler.htm (Last visited Sept. 4, 2005).

defendants Jordan, Farrar, and McCraw violated the Whistleblower Protection Act and the plaintiff's First Amendment rights by threatening and imposing disciplinary action because he raised safety concerns. *Id.* ¶ 45.

On July 3, 2003, the plaintiff filed his third administrative charge, which again alleged sex discrimination and retaliation. *Id.* ¶ 39. This charge had three bases. First, the plaintiff alleged that on April 15, 2003, he was charged with insubordination based on an email message he had sent to Sharon Singleton, a nurse in the FBI's Health Care Programs Unit, causing the FBI-OPR again to open an investigation. *Id.* ¶ 39b. The investigation included an allegedly unrelated January 15, 2003 electronic communication ("EC") that the plaintiff had sent the defendant Jordan, via the Ombudsman, claiming misconduct by a Training Division supervisory special agent. *Id.* Second, the plaintiff alleged that while his personal safety concerns went ignored, Singleton's allegations against him were investigated. *Id.* ¶ 39a. Third, he claimed that on February 26, 2004, he was removed from his instructor assignment at the FBI Training Academy and removed from the Quantico facility altogether.[6] *Id.* ¶ 39c. The FBI dismissed this administrative charge as well, but the plaintiff did not appeal the decision to the EEOC. *Id.* ¶ 12.

While all this was going on, a number of the plaintiff's colleagues made reference to his medical history or made allegedly false statements about him. On November 19, 2002, the defendant Bullock informed Keith Slotter, the plaintiff's Section Chief at the time, about the plaintiff's past medical diagnoses. *Id.* ¶ 40. In April or May of 2003, Singleton provided FBI-OPR investigators with false information about the plaintiff's psychological condition, depicting

---

[6]       The plaintiff amended his third administrative charge to include this incident at Quantico.

him as a "stalker."  *Id.* ¶ 42.  In May or June of 2002, Louden wrote a letter containing "false and defamatory statements" about the plaintiff.  *Id.* ¶ 43.  In a December 8, 2003 sworn statement given as part of the plaintiff's third administrative charge, defendant Bullock stated that he had reviewed communications concerning the plaintiff's fitness-for-duty exam and that medical professionals had diagnosed him with "obsessive compulsive personality disorder."  *Id.* ¶ 46.  In a January 14, 2004, sworn statement, William Coggins, Section Chief of the Personnel Assistance Section of the FBI's Administrative Services Division, stated that (1) he had helped draft the Farrar Letter, knew of the plaintiff's fitness-for-duty examinations, and thus had knowledge of the plaintiff's psychological evaluations, (2) he had asked Singleton to draft an EC to send to Jordan, Ashley, and the FBI's Security Division, after she felt threatened when she read the plaintiff's email message to her, and (3) he had apprised Jeffrey Berkin, Deputy Assistant Director of the Security Division, of the plaintiff's email message to Singleton and her reaction to it and asked him to supply a photo of the plaintiff for Singleton to have on hand.  *Id.* ¶¶ 48-49.

As a result of all the aforementioned, the plaintiff states that he suffered emotional and physical pain and suffering, as well as lost income.  *Id.* ¶ 50-51.

The plaintiff initiated the instant suit on April 30, 2005.  On January 14, 2005, the plaintiff amended his complaint.  The defendants filed the pending motion to dismiss on February 7, 2005.  The court now turns to this motion.

### III.   ANALYSIS

### A.   Legal Standards

### 1.   Legal Standard for a Motion to Dismiss Pursuant to Rule 12(b)(1)

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938); *see also Gen. Motors Corp. v. Envtl. Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004) (noting that "[a]s a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction").

Because "subject-matter jurisdiction is an 'Art. III as well as a statutory requirement[,] no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003) (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxite de Guinea*, 456 U.S. 694, 702 (1982)).  On a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject-matter jurisdiction.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  The court may dismiss a complaint for lack of subject-matter jurisdiction only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Empagran S.A. v. F. Hoffman-Laroche, Ltd.*, 315 F.3d 338, 343 (D.C. Cir. 2003) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

Because subject-matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim.  *Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003); *Grand Lodge of*

*Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  Moreover, the court

is not limited to the allegations contained in the complaint.  *Hohri v. United States*, 782 F.2d 227,

241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987).  Instead, to determine

whether it has jurisdiction over the claim, the court may consider materials outside the pleadings.

*Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

## 2.  Legal Standard for Rule 12(b)(6) Motion to Dismiss

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint.  *Browning v.*

*Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  The complaint need only set forth a short and plain

statement of the claim, giving the defendant fair notice of the claim and the grounds upon which

it rests.  *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003) (citing

FED R. CIV. P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  "Such simplified notice

pleading is made possible by the liberal opportunity for discovery and the other pre-trial

procedures established by the Rules to disclose more precisely the basis of both claim and

defense to define more narrowly the disputed facts and issues."  *Conley*, 355 U.S. at 47-48

(internal quotation marks omitted).  It is not necessary for the plaintiff to plead all elements of his

prima facie case in the complaint, *Swierkiewicz v. Sonoma N.A.*, 534 U.S. 506, 511-14 (2002), or

"plead law or match facts to every element of a legal theory."  *Krieger v. Fadely*, 211 F.3d 134,

136 (D.C. Cir. 2000) (internal quotation marks and citation omitted).

Accordingly, "the accepted rule in every type of case" is that a court should not dismiss a

complaint for failure to state a claim unless the defendant can show beyond doubt that the

plaintiff can prove no set of facts in support of his claim that would entitle him to relief.  *Warren*

*v. District of Columbia*, 353 F.3d 36, 37 (D.C. Cir. 2004); *Kingman Park*, 348 F.3d at 1040.

Thus, in resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations – including mixed questions of law and fact – as true and draw all reasonable inferences therefrom in the plaintiff's favor. *Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C. Cir. 2003); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003); *Browning*, 292 F.3d at 242. While many well-pleaded complaints are conclusory, the court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations. *Warren*, 353 F.3d at 39; *Browning*, 292 F.3d at 242.

### B. The Court Grants the Defendants' Motion to Dismiss the Title VII Sex Discrimination and Retaliation Claims

The plaintiff sets forth four counts of Title VII sex discrimination and reprisal violations based on a series of events spanning five years. Count I, a sex discrimination claim, encompasses the charges he made in his first administrative charge; Count II, a "sex and/or reprisal" discrimination claim as well as Count III, a reprisal claim, reflect the charges he made in his second administrative charge; and Count IV, another "sex and/or reprisal" claim, is based on his third administrative charge. As aforementioned, the Justice Department dismissed all three complaints and the EEOC rejected the plaintiff's appeals in the first two complaints.[7] Am. Compl. ¶¶ 10-12. The defendants argue that none of these counts state a claim under Title VII because none of the discriminatory acts the plaintiff alleges within them amount to "adverse actions." Defs.' Mot. to Dismiss ("Defs.' Mot.") at 3. The court agrees and accordingly grants the defendants' motion to dismiss as to Counts I, II, III, and IV.

---

[7] The plaintiff is not appealing the Justice Department's dismissal of his third complaint to the Equal Employment Opportunity Commission ("EEOC") but instead challenges the decision in this court under 29 C.F.R. § 1614.407(a). Am. Compl. ¶ 12.

### 1.    Adverse Action Requirement

As a preliminary matter, the court recognizes, as noted above, that the plaintiff is not required to establish a *prima facie* case of employment discrimination in order to survive the defendants' motion to dismiss.  *See Swierkiewicz v. Sorema*, 534 U.S. 506, 515 (2002) (involving discriminatory demotion and termination allegations); *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (involving discriminatory failure to promote and termination allegations).  Nevertheless, courts may explore the plaintiff's *prima facie* case at the dismissal stage.  *Rochon v. Ashcroft*, 319 F. Supp. 2d 23, 29 (D.D.C. 2004) (granting the defendant employer's motion to dismiss a Title VII retaliation claim for, *inter alia*, lack of an allegation amounting to a legally cognizable adverse action).  Instead, courts are allowed "to probe whether the plaintiff can ever meet his initial burden to establish a *prima facie* case."  *Id.* at 29; *see also Brooks-Miller v. England*, 357 F. Supp. 2d 197, 201 n.2 (D.D.C. 2004) (granting the defendant employer's motion to dismiss a Title VII retaliation claim because, *inter alia*, the plaintiff's lateral transfer to a front desk position did not amount to a legally cognizable  adverse action).  This is because "litigants may plead themselves out of court by alleging facts that establish defendants' entitlement to prevail."  *Rochon*, 319 F. Supp. 2d at 29.

Also, while Title VII plaintiffs do not need to set forth the *prima facie* case as to each count to survive a motion to dismiss for failure to state a claim, they must present facts that would establish elements of each claim.  *Major v. Plumbers Local Union No. 5.*, 370 F. Supp. 2d 118, 128-29 (D.D.C. 2005).  The court therefore probes the *prima facie* case that the plaintiff must establish, and the facts that the plaintiff has alleged, and concludes that unlike the demotion, failure to promote, and termination allegations at the heart of the plaintiffs' claims in

*Swierkiewicz* and *Sparrow*, the types of allegations the plaintiff makes here – even when assumed as true – do not amount to legally cognizable adverse actions and therefore would not enable him to ever establish a *prima facie* case under Title VII.

Title VII claims alleging disparate treatment discrimination or discrimination based on retaliation both require the plaintiff to show that he suffered an adverse action at the hands of the employer. *Brown v. Brody*, 199 F.3d 446, 452-53 (D.C. Cir. 1999). Under the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), a plaintiff alleging disparate treatment under Title VII must first establish a *prima facie* case showing that (1) he or she is a member of a protected class, (2) he or she was subject to an adverse employment action, and (3) that the unfavorable action gives rise to an inference of discrimination. *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002); *Carter v. Greenspan*, 304 F. Supp. 2d 13, 27 (D.D.C. 2004). For retaliation claims, the plaintiff must show: "1) that [he] engaged in a statutorily protected activity, 2) that the employer took an adverse personnel action; and 3) a causal connection existed between the two." *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003) (alteration in original) (citation omitted). Thus, "a common element required for discrimination and retaliation claims . . . is . . . some form of legally cognizable adverse action by the employer." *Brown*, 199 F.3d at 453.

In determining whether an employer's conduct constitutes an adverse action, "courts have consistently focused on ultimate employment decisions such as hiring, granting leave, promoting, and compensating . . . [and not] interlocutory or intermediate decisions having no immediate effect upon employment decisions." *Dobbs v. Roche*, 329 F. Supp. 2d 33, 41 (D.D.C. 2004) (alteration in original) (quoting *Walker v. Wash. Metro. Area Transit Auth.*, 102 F. Supp. 2d 24,

28 (D.D.C. 2000)).  Therefore, not "all personnel decisions with negative consequences for the employee" qualify as legally cognizable adverse actions. *Ware v. Billington*, 344 F. Supp. 2d 63, 71 (D.D.C. 2004) (citing *Forkkio*, 306 F.3d at 1130-31).  Absent a reduction in pay or benefits, only those actions creating "materially adverse consequences affecting the terms, conditions, or privileges of [his] employment or [his] future employment opportunities" amount to adverse actions. *Brown*, 199 F.3d at 457.  A "tangible change in the duties or working conditions constituting a material employment disadvantage" is necessary, or a significant change in employment status, such as hiring, firing, failing to promote, or a reassignment with significantly different responsibilities. *Mack v. Strauss*, 134 F. Supp. 2d 103, 111 (D.D.C. 2001) (citations omitted).  Stated differently, "[n]ot everything that makes an employee unhappy is a judicially actionable adverse action." *Burton v. Batista*, 339 F. Supp. 2d 97, 110 (D.D.C. 2004) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)).  Instead, an employee must suffer "objectively tangible harm." *Brown*, 199 F.3d at 457.  Therefore, purely subjective injuries, such as dissatisfaction with a reassignment or public humiliation or loss of reputation, do not constitute adverse actions. *Forkkio*, 306 F.3d at 1130 (citations omitted).

### 2.   The Plaintiff's Allegations do not Constitute Adverse Actions

Against this backdrop, the court turns to the plaintiff's litany of allegations.  Because an adverse action is required for both sex discrimination claims and retaliation claims, in analyzing the allegations comprising Counts I, II, III, and IV, it makes no difference whether a particular allegation falls within the plaintiff's sex discrimination claim, his reprisal claim, or his "sex and/or reprisal" claims.  The court therefore addresses his allegations by category, rather than by count, and concludes that none of them amount to adverse actions on the part of the FBI or the

Department of Justice.  Significantly, the plaintiff does not allege a demotion or failure to promote, a reduction in pay or benefits, a suspension,[8] or any other deed that would rise to the level of an adverse action.

### a.    Failures to Investigate Complaints

In one category of allegations, the plaintiff claims that the FBI-OPR did not investigate some of his allegations.  In Count I, he makes the vague claim that the June 2001 Findings Letter shows that allegations he made "concerning a female FBI employee's action were not referred to OPR for investigation" and that allegations he made to FBI-OPR "were not accepted . . . for investigation."[9]  Am. Compl. ¶ 54a.  In fact, the Findings Letter does not reference any allegations made by the plaintiff but instead informs the plaintiff that, following an investigation, the FBI-OPR found that he violated FBI policy by (1) "focusing inappropriate attention" on two female special agents, creating a situation they felt was not only uncomfortable but "potentially

---

[8]      The plaintiff does not include his 2003 seven-day suspension in any of his sex discrimination or reprisal claims, even though a suspension does qualify as an adverse action.  *Holbrook v. Reno*, 196 F.3d 255, 263 (1999) (holding that a five-day suspension amounts to an adverse personnel action).  In any event, as the defendants point out, the plaintiff has not exhausted his administrative remedies with respect to the suspension because he did not include the suspension in his third administrative charge or amend the charge accordingly after filing it.  Defs.' Mot. at 16-18; *see also Romero-Ostolaza*, 370 F. Supp. 2d 139, 149 (2005) (noting that recovery for plaintiffs alleging discrete acts of retaliation is barred when they do "not file a new complaint or amend the old complaint"); *Velikonja v. Mueller*, 315 F. Supp. 2d 66, 74-75 (2004) (dismissing a Title VII due process claim for failure to exhaust when the plaintiff did not amend her administrative charge).

[9]      According to the plaintiff, these allegations refer to an incident in September 1999, when an FBI Academy employee, acting on a female employee's accusation that the plaintiff had "stalked her," followed him around the gun vault and post office to ensure that he did not proceed to the area where the female employee's unit was located.  Pl.'s Opp'n at 12-13, Ex. 2.  These and related events formed the basis of the plaintiff's first administrative charge and underlies the "safety issue" the plaintiff references in his Title VII, Whistleblower Protection Act, and First Amendment claims.  *See infra* Parts III.D-E.

threatening"; (2) accessing, as many as 2,000 times, the voice mail system of one of the special agents without authorization; and (3) interfering with the same special agent's attempt to secure a bank loan.  Defs.' Mot., Ex. 10.  These findings resulted in a five-day suspension in 2001 and one year of probation.  *Id.*  Even if the Findings Letter did indicate that the plaintiff had made an allegation that was not investigated, this alone would not constitute an adverse action.  *See Rochon*, 319 F. Supp. 2d at 31 (holding that the FBI's failure to respond to death threats made by an organized crime figure against a special agent and his wife did not constitute an adverse action).  "The FBI's alleged failure to investigate" alone does not make up a "tangible, affirmative legally cognizable adverse action by the FBI."  *Id.*  Therefore the plaintiff fails to state a Title VII claim with respect to this allegation.

In Count IV, the plaintiff claims that the FBI ignored his allegations of the "safety issue" at Quantico, yet the FBI investigated allegations of safety concerns made by a "female  nurse," Sharon Singleton, "whom he had never met."[10]  Am. Compl. ¶ 68a.  A section chief ignored the

---

[10]     As discussed *infra* Part III.B.2.c., however, although the plaintiff and The court is wary, however, that the plaintiff's hostile work environment claim seems, fundamentally, to be a rehash of "the specific alleged incidents of discrimination" he raises in other counts throughout his amended complaint.  *See Lester v. Natsios*, 290 F. Supp. 2d 11, 31-32 (D.D.C. 2003) (noting that "it is not at all clear that mere reference to alleged disparate acts of discrimination . . . can ever be transformed, without more, into a hostile work environment claim").  Unlike the *Lester* court, however, which held that the plaintiff could not support a hostile work environment claim based on previously alleged "myriad specific discriminatory acts" – none of which amounted to adverse actions – the court here is scrutinizing such a claim on a motion to dismiss, not a motion for summary judgment.  In addition, unlike the plaintiff in *Lester*, here the plaintiff goes further in compiling his hostile work environment claim.  Rather than repeating only his allegations of discrete acts of discrimination, he also includes the allegations that constitute his Privacy Act claim, discussed *infra* in III.F.  Singleton may never have met face-to-face, the plaintiff had sent her an email message, which apparently prompted her safety concerns regarding the plaintiff.  Singleton claimed she felt the plaintiff's

plaintiff's safety issues but investigated Singleton's safety concerns, the plaintiff alleges, by encouraging her to write to various FBI offices and officials about her concerns, notifying a Security Division official about them, and obtaining a photograph of the plaintiff to give to Singleton. *Id.* Again, with respect to the plaintiff's "safety issue" at Quantico (which, as the Farrar Letter indicates, FBI officials found to be without merit), the FBI's failure to investigate his complaint does not constitute an adverse action. *See Rochon*, 319 F. Supp. 2d at 31. Because he did not suffer an adverse action, the plaintiff's inference that Singleton, as a female employee, was treated differently than he was based on gender is not relevant. Furthermore, the court views this allegation as apples and oranges; FBI officials' investigation into Singleton's fear of the plaintiff is unrelated to their alleged lack of investigation into the plaintiff's fears of "physical confrontations" at Quantico. Am. Compl. ¶ 32.

### b. Delay in Providing Promised Assignment

Another type of allegation, also made in Count I, involves reassignment. The plaintiff states that he was told June 1, 2001, that he would be placed in a permanent assignment, but that as of July 30, 2001, the assignment had not been made.[11] Am. Compl. ¶ 54b. Without more, this does not amount to an adverse action. A purely lateral transfer – one that does not involve a demotion in form or substance – does not rise to the level of an adverse employment action. *Brown*, 199 F.3d at 455-56 (citing *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir.

---

email message "was threatening and intimidating." Defs.' Mot., Ex. 1.

[11]    The timing of this allegation changes in the plaintiff's opposition to the defendants' motion to dismiss, where he states that he did not receive his assignment to FBI headquarters until the week of September 9, 2001, "nearly two years after" he was originally scheduled to report. Pl.'s Opp'n at 13. The inadequacy of the allegation, however, is the same whether the delay was two months or two years.

1997)).  Nor does a denial of such a transfer without accompanying "materially adverse consequences" amount to an adverse action.  *Id.* at 457.  A Title VII claim involving the denial of a lateral transfer must be dismissed unless the plaintiff alleges consequences "affecting the terms, conditions, or privileges" of employment or future employment opportunities.  *Bowie v. Ashcroft*, 283 F. Supp 2d 25, 33 (D.D.C. 2003) (quoting *Brown*, 199 F.3d at 457).  Unlike the plaintiff in *Bowie*, who alleged that the Justice Department's failure to assign her to an acting management position could affect her future promotional opportunities, the plaintiff here alleges nothing to show how the delay in his assignment constituted a "tangible change" in his employment status.  *See Bowie*, 283 F. Supp. 2d at 33; *see also Mack*, 134 F. Supp. 2d at 114 (holding that a delay in receiving a performance evaluation did not constitute an adverse action).  Therefore, the plaintiff's delayed assignment claim does not rise to the level of an adverse action.

### c.   Disciplinary Actions

A third category of allegations relates to various acts of discipline taken against the plaintiff.  None amount to a legally cognizable adverse employment action.  In Count II, for example, the plaintiff alleges that he learned in May 2002 that "employees who he had complained about unwanted contacts" were not required to sign a "no-contact" agreement but that he had been required to sign such an agreement in September 1999, based on complaints from a female employee.  Am. Compl. ¶ 57b.  This allegation fails to set forth specific facts to support a gender discrimination claim.  *See Major*, 370 F. Supp. 2d at 128-29 (citations omitted).  The plaintiff fails to allege how his signing a "no-contact" agreement, while others did not, subject him to adverse employment action.  *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) (stating that "the Supreme Court's holding in *Swierkiewicz v. Sorema , N.A.*, 534

U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), did not alter the basic pleading requirement that a plaintiff set forth facts sufficient to allege each element of his claim") (citations omitted). Indeed, the fact that the plaintiff learned nearly three years after signing his no-contact agreement that other employees did not have to sign a no-contact agreement implies that his work conditions were not affected by this situation.

The plaintiff also alleges, in Count IV, that he was charged with insubordination in April 2003, after sending an email message to Singleton, the nurse.  Am. Compl. ¶ 68b.  It appears that the email message, which the plaintiff himself described in his third complaint as "sarcastic" and "gloating" and which admonished the nurse for "joining someone else's 'pathology'" and being "dishonest," was investigated as a possible violation of the Farrar Letter ordering the plaintiff to stop raising old, unsubstantiated allegations against his colleagues.  Pl.'s Opp. 14, Ex. 5.  The plaintiff argued that because the email did not request action by anyone in management or the FBI-OPR, it did not violate the Farrar Letter.  *Id*., Ex. 5.  As a result of Singleton's complaints, the FBI-OPR opened an investigation into the email message and, apparently, then began investigating another electronic communication that the plaintiff had sent to the defendant Jordan alleging misconduct on the part of a supervisory special agent.  Am. Compl. ¶ 68b.  Again, the plaintiff has only alleged that he was charged with insubordination.  Formal letters of admonishment and disciplinary notices that have no effect on an employee's grade or salary level, job title, duties, benefits or work hours, for example, do not constitute adverse actions. *Harris v. Potter*, 310 F. Supp. 2d 18, 21 (D.D.C. 2004) (holding that a letter of warning over an employee's attendance did not constitute an adverse action and therefore failed to state a Title VII claim); *cf. Ware*, 344 F. Supp. 2d at 71 (holding that a letter of warning removing plaintiff's

18

supervisory responsibilities does constitute an adverse action).  Nor does being faced with formal disciplinary action constitute an adverse employment action.  *See Romero-Ostolaza*,  370 F. Supp. 2d 139, 150-51 (D.D.C. 2005) (holding that the plaintiff failed to state a claim when he was placed on an "employee proficiency plan").  Accordingly, the plaintiff's insubordination claim fails to state an adverse action.

The plaintiff alleges another disciplinary act in Count IV, stating that in February 2004, he was removed from his instructor assignment at the FBI Training Academy in Quantico and escorted off the facility by his unit chief, in part over concern for the plaintiff's safety.  Am. Compl. ¶ 68c.  According to the complaint, the plaintiff learned through his unit chief that FBI Training Academy members "were always armed, whenever there were suspicions that Plaintiff was in the area of the Academy," and that an FBI section chief was planning to send armed FBI Academy Police to escort the plaintiff off the facility.  *Id.*  The plaintiff alleges that because of his removal, he was forced to withdraw from training at the Academy, "a required part of his continued employment with the FBI."  *Id.*  The court concludes that this incident cannot support the plaintiff's Title VII claims because being closely supervised or "watched" does not constitute an adverse employment action.  *See Lester v. Natsios*, 290 F. Supp. 2d 11, 30 (D.D.C. 2003); *Burton*, 339 F. Supp. 2d at 111.  Being subject to "scrupulous monitoring" does not constitute an adverse action because "it is part of the employer's job to ensure that employees are safely and properly carrying out their jobs."  *Hussain v. Principi*, 344 F. Supp. 2d 86, 104-05 (D.D.C. 2004).  The fact that FBI security officials, for whatever reason, may have "scrupulously monitored" the plaintiff during his training assignment at Quantico and removed him does not amount to an adverse action, especially when the plaintiff acknowledges that this was done in

part for his own safety.  Pl.'s Opp'n at 36.  To the extent that the plaintiff alleges that this

removal from Quantico adversely impacts his employment at the FBI, the court notes that the

Farrar Letter suggests otherwise.  The letter, stating that the plaintiff had "presented no credible

evidence to suggest that anyone . . . has expressed any intent to harm" him, instructed the

plaintiff to confer with his immediate supervisor if he felt unable to perform assignments at

Quantico, and if that did not alleviate his concerns, to request use of the Baltimore Field Office

instead.  Defs.' Mot, Ex. 6.  Accordingly, the plaintiff's disciplinary claims do not rise to the

level of an adverse actions.

### d.   Investigations Into the Plaintiff's Conduct

In the last category of allegations, the plaintiff claims, redundantly, that he was subject to

various investigations by FBI officials.  In Count I, he alleges that he was subject to an

investigation over allegations made by special agents Terri Royster and Rebecca Granger,

whereas his allegations against them were not investigated.[12]  Am. Compl. ¶ 54c.  Royster and

Granger's allegations and the resulting investigation culminated in the 2001 Findings Letter

issued to the plaintiff and his five-day suspension.  The fact that the plaintiff was subject to an

investigation does not amount to an adverse action because "mere investigations by [an]

employer . . . have no adverse effect on plaintiff's employment."  *Mack*, 134 F. Supp. 2d at 114.

If an investigation is dismissed, an employee would not have suffered any adverse effect.  *Id.*

(citing *Yerdon v. Henry*, 91 F.3d 370, 378 (2d Cir. 1996)).  Here, the investigation was not

dismissed and in fact resulted in the plaintiff's suspension, but the plaintiff has not included that

---

[12]     The plaintiff repeats this allegation in Count II and adds a charge that an employee
copied his mail and forwarded it to the FBI-OPR.  Am. Compl. ¶ 57a.

suspension in any of his discrimination claims.  The plaintiff's investigation allegation, alone, is not an adverse action.  *See Ware*, 344 F. Supp. 2d at 76 (stating that "although the discipline imposed as a result of an investigation may have a sufficiently adverse effect on plaintiff's employment to be actionable, the mere initiation of the investigation does not").  In addition, the plaintiff's "general allegation" that female employees' complaints were investigated while his were not does not create an adverse employment action in and of itself.  *Carter*, 304 F. Supp. 2d at 27 (finding no adverse action when a male employee was reprimanded for absenteeism while female employee's absenteeism "did not seem to concern management"); *see also Forkkio*, 306 F.3d at 1130-31.  The plaintiff's claim fails because he does not allege any specific facts showing he suffered materially adverse consequences when the FBI allegedly failed to investigate his complaints against  Royster and  Granger.  *See Major*, 370 F. Supp. 2d at 128-29 (citations omitted).

Finally, the plaintiff alleges in Count III that FBI Deputy Assistant Director Thomas Locke made "false and groundless" allegations to FBI-OPR that caused the plaintiff to be subjected to an investigation lasting eleven months.  Am. Compl. ¶ 63.  Also, part of the investigation was an allegation of the plaintiff's computer misuse in July 2002.  *Id.* ¶ 64.  Locke's allegations were motivated out of reprisal, the plaintiff alleges, because Locke and FBI-OPR officials were dragged into the investigation of the plaintiff's first charge and subsequent EEOC charge by being forced to provide sworn statements.  *Id.* ¶ 11, 65.[13]  They allegedly wanted to punish the plaintiff and inhibit other FBI employees from filing EEOC charges.  *Id.*

---

[13]     The plaintiff repeats these allegations in Count II of the complaint and form part of the plaintiff's second administrative and EEOC charges.  Am. Compl. ¶ 57c, 57d.

Locke's allegations and the computer misuse allegation were not substantiated, and the FBI-OPR

dropped the investigation. *Id.* ¶ 64. Even assuming all this as true, as mentioned, the request for

an investigation by an independent body (here, the FBI-OPR) does not constitute an actionable

adverse employment action. *Ware*, 344 F. Supp. 2d at 76; *see also Velikonja*, 315 F. Supp. 2d at

75 (holding that referral of an FBI employee to OPR for an investigation does not rise to the level

of an adverse action). This is true even if the investigation was based on false allegations.

*Childers v. Slater*, 44 F. Supp. 2d 8, 20 (D.D.C. 1999), *modified on reconsideration*, 197 F.R.D.

185 (D.D.C. 2000) (concluding that "false accusations without negative employment

consequences are not employment decisions actionable under Title VII"). Therefore, this claim

fails as well.

### C.   Count V: Discrimination Based on Retaliatory Hostile Work Environment

#### 1.   Legal Standard for Hostile Work Environment

Title VII prohibits an employer from discriminating against any individual with respect to

compensation, terms, conditions, or privileges of employment because of race, color, religion,

sex, or national origin. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Toward that end, an

employer may not create or condone a hostile or abusive work environment that is

discriminatory. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986). Such an

environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation,

ridicule and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment.'" *Singletary v. District of Columbia*,

351 F.3d 519, 526 (D.C. Cir 2003) (quoting *Meritor*, 477 U.S. at 65, 67). On the other hand,

"[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work

environment – an environment that a reasonable person would find hostile or abusive – is beyond

Title VII's purview." *Harris*, 510 U.S. at 21. Thus, to determine whether a hostile work

environment exists, the court looks to the totality of the circumstances, including the frequency

of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an

employee's work performance. *Id.* at 23; *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88

(1998). In considering the totality of the circumstances, however, the court is mindful that

> [e]veryone can be characterized by sex, race, ethnicity or (real or perceived) disability; and many bosses are harsh, unjust and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

*Bryant v. Brownlee*, 265 F. Supp. 2d. 52, 63 (D.D.C. 2003) (quoting *Alfano v. Costello*, 294 F.3d

365, 377 (2d Cir. 2002)).

### 2.  The Court Denies the Defendants' Motion to Dismiss the Title VII Hostile Work Environment Claim

The defendants assert that the plaintiff's retaliatory hostile work environment claim,[14]

which is comprised essentially of the plaintiff's allegations from Counts I-IV, his 2003 seven-day

suspension, and various incidents relating to the disclosure of his medical background, fails to

state a claim. Defs.' Mot. at 8-12. The plaintiff's attempt to "cobble together various matters

alleged in the preceding counts," according to the defendants, fails because those "various

matters" do not describe the kind of objective intimidation, ridicule, or insult required for a

---

[14]     Although hostile work environment claims "more frequently accompany Title VII gender, race or national origin discrimination than retaliation claims," courts in this circuit have recognized claims of hostile work environment based on retaliation. *Brodetski v. Duffey*, 141 F. Supp. 2d 35, 48 (D.D.C. 2001); s*ee also Baloch v. Norton*, 355 F. Supp. 2d 246, 261 (D.D.C. 2005).

hostile work environment claim.  *Id.* at 9, 12.  On a motion to dismiss, however, this conclusion is premature.

Unlike discrete acts of discrimination, hostile work environment claims do not require a plaintiff to allege something as specific as an "adverse employment action."  *Ware v. Billington*, 344 F. Supp. 2d 63, 71 n.1 (D.D.C. 2004).  "[I]n direct contrast to discrete acts, a single act of harassment [as part of a hostile work environment claim] may not be actionable on its own." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (citation omitted).  Hostile work environment claims, instead, "are based on the cumulative effect of individual acts" that, collectively, "constitute one unlawful employment practice."  *Id.* at 115, 117 (internal quotation marks and citations omitted).  Thus, even though the court holds that none of the plaintiff's allegations in Counts I-IV constitute adverse actions – and therefore the plaintiff fails to state any claims of discrete acts of discrimination or retaliation – it concludes that the plaintiff has alleged enough at this stage to be entitled to show that the cumulative effect of his allegations amounts to a hostile work environment.

The plaintiff alleges that he "began to suffer a series of incidents" – eleven of which are specified in his amended complaint – motivated out of retaliation for his filing administrative and EEOC charges.  Am. Compl. ¶ 76, 77.  These alleged incidents of retaliation include: (1) defendant Jordan suspending the plaintiff for seven days in 2003 for violating the conditions of

the Farrar Letter;[15] (2) Assistant Director Steve McCraw denying the plaintiff's suspension

appeal; (3) defendant Bullock informing the plaintiff's then-Section Chief, Keith Slotter, about

the plaintiff's past medical diagnoses; (4) the FBI Health Care Program Unit Chief requesting

updated information relating to the plaintiff's past medical issues; and (5) Former Acting

Assistant Director and Section Chief John Louden providing a letter containing false and

defamatory statements about the plaintiff in support of a recommendation of a harsh punishment

for the plaintiff.[16]  Am. Compl. ¶¶ 76 d-i.

---

[15]   The defendants argue that the plaintiff's suspension cannot be included in his hostile work environment claim because it is a discrete adverse employment action that must be independently and timely exhausted (which, as discussed *supra* at footnote 3, the plaintiff did not do). Defs.' Mot. at 13-14.  The court concludes that this requirement does not apply here.  It is true that each discrete adverse employment action individually triggers Title VII's procedural requirements, *Coleman-Adebayo v. Leavitt*, 326 F. Supp. 2d 132 (D.D.C. 2004), and discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  These rules, however, are in place to prevent employees from "piggy-backing" unexhausted claims of discrete discriminatory acts onto properly exhausted ones. *Leavitt*, 326 F. Supp. 2d at 137-38. A different rule applies to hostile work environment claims because such claims do not "occur" at a particular time when a filing period could be set to begin.  *Leavitt*, 326 F. Supp. 2d at 137.  The incidents comprising a hostile work environment are part of one unlawful employment practice; Title VII does not separate individual acts that are part of the hostile work environment claim from the whole for purpose of timely filing and liability. *Morgan,* 536 U.S. at 118.

[16]   The remaining six specified incidents that the plaintiff includes in his retaliatory hostile work environment claim are some of the same alleged incidents – copied largely verbatim from earlier points in his amended complaint – that also form the basis of his Count I-IV claims.  It appears that the plaintiff's proficiency with his word processor's cut-and-paste feature in compiling his hostile work environment claim got the best of him with respect to one allegation, however.  The plaintiff is alleging a hostile work environment based on retaliation for his filing administrative and EEOC charges.  As the defendants point out, Former Acting Assistant Director and Section Chief John Louden's "false and defamatory" letter – supposedly "instrumental" to the May 29, 2001 Findings Letter – could not have been written out of retaliation for the plaintiff's filing administrative or EEOC charges, as the plaintiff alleges. Defs.' Mot. at 11; Am. Compl. ¶ 76i.  On May 29, 2001, there was nothing to retaliate against yet because the plaintiff's first administrative charge was not filed until June 21, 2001.  *Id.*; Am. Compl. ¶ 53, 54a. Thus, to the extent that the plaintiff alleges the Louden letter was written with retaliatory

25

Taking all these allegations as true, the court concludes that it cannot dismiss the plaintiff's hostile work environment for failure to state a claim.  The plaintiff is alleging that various FBI officials subjected him to a series of acts of retaliation – including being suspended without pay, physically removed from his workplace, and being subject to false accusations – occurring over several years in response to his filing several administrative and EEOC charges.  At the dismissal stage, the court cannot say, based on these allegations, that the plaintiff can prove no set of facts to support his hostile work environment claim.[17]  Accordingly, the court denies the defendant's motion to dismiss the plaintiff's hostile work environment claim.

### D.   The Court Grants the Defendants' Motion to Dismiss Count VI: the Whistleblower Claim

It is undisputed that because the plaintiff is an FBI employee, his reprisal claim under the Whistleblower Protection Act ("WPA"), Pub. L. No. 101-12 (1989), is subject to statutory and regulatory provisions separate from those governing most federal employees.  Defs.' Mot. at 21;

---

animus for events occurring before the plaintiff filed his first administrative charge, the allegation is dismissed.  *See Carter v. Greenspan*, 304 F. Supp. 2d 13, 29 (D.D.C. 2004) (noting that plaintiff's hostile work environment claim alleging acts of retaliatory treatment occurring before the plaintiff filed his sexual harassment charge "undermines any causal inference").

[17]   The court is wary, however, that the plaintiff's hostile work environment claim seems, fundamentally, to be a rehash of "the specific alleged incidents of discrimination" he raises in other counts throughout his amended complaint.  *See Lester v. Natsios*, 290 F. Supp. 2d 11, 31-32 (D.D.C. 2003) (noting that "it is not at all clear that mere reference to alleged disparate acts of discrimination . . . can ever be transformed, without more, into a hostile work environment claim").  Unlike the *Lester* court, however, which held that the plaintiff could not support a hostile work environment claim based on previously alleged "myriad specific discriminatory acts" – none of which amounted to adverse actions – the court here is scrutinizing such a claim on a motion to dismiss, not a motion for summary judgment.  In addition, unlike the plaintiff in *Lester*, here the plaintiff goes further in compiling his hostile work environment claim.  Rather than repeating only his allegations of discrete acts of discrimination, he also includes the allegations that constitute his Privacy Act claim, discussed *infra* in III.F.

Pl.'s Opp'n at 25.

The plaintiff's whistleblower claim centers on two series of disclosures he allegedly made to various FBI officials and offices between 2002 and 2004.  Am. Compl. ¶¶ 13-14.  In the first set, which he specifically described as "protected disclosures," he reported on three occasions his concerns about his and the public's safety over the possibility of a "violent confrontation" with armed FBI personnel at Quantico.  *Id.* ¶¶ 81-83.  Specifically, the plaintiff alleges that he reported this concern to the FBI Office of the Director, through the ombudsman, in April 2002; to the FBI Administrative Services Division, also through the ombudsman, in June 2002; and to Grant Ashley, Assistant Director of the FBI's Criminal Investigation Division, in October 2002.  *Id.* ¶ 81.  In the second set of disclosures, the plaintiff alleges that he reported WPA reprisal violations to the DOJ's Office of Inspector General ("DOJ-IG") in September 2003, twice in October 2003, and February 2004.[18]  *Id.* ¶ 14.

---

[18]     The plaintiff and defendants disagree over whether the plaintiff actually made any "protected disclosures" as defined under FBI whistleblowing regulations, which requires that disclosures be made to one of eight offices or officials within the DOJ and FBI.  *See* 28 C.F.R. § 27.1(a).  The defendants argue that because the plaintiff reported his safety concern "through the ombudsman" to the Office of the FBI Director – one of the offices listed in § 27.1(a) – he actually made a disclosure to the FBI ombudsman, not the Director's office, and thus did not make a "protected disclosure" under the whistleblower rules.  Defs.' Mot. at 23-24.  Likewise, the defendants argue that the plaintiff made his disclosure to the Administrative Services Division "through the ombudsman" and, moreover, that division is not listed in § 27.1(a).  Defs.' Reply at 17; Defs.' Mot. at 24.  The Criminal Investigation Division is not listed in that section, either.  Defs.' Reply at 17.  The defendants further argue that the plaintiff's four disclosures to DOJ's Office of Inspector General ("DOJ-IG") – which is a receiving office listed in § 27.1(a) – do not constitute "protected disclosures" because the disclosures were merely allegations of reprisals for the plaintiff's previous disclosures, not protected disclosures in and of themselves.  Defs.' Reply at 17.  For his part, the plaintiff does not address the defendants' "ombudsman" distinction and instead only asserts that his disclosures to DOJ-IG  constitute protected disclosures.  Pl.'s Opp'n to Defs. Mot. to Dismiss at 26.  Because the court does not have subject matter jurisdiction over the plaintiff's whistleblower claim, it does not have to address these issues.

The plaintiff alleges that instead of fully investigating his disclosures, the FBI retaliated against him for his "whistleblowing activity" by: (1) issuing the Farrar Letter ordering him to stop raising his Quantico safety concerns; (2) having defendant Bullock transmit the letter and admonishing him to comply with it; (3) suspending him in July 2003 for violating the letter; and (4) denying his appeal of the suspension in September 2003. *Id.* ¶¶ 83, 85.

Most federal employees are protected from whistleblowing reprisal under 5 U.S.C. § 2302 of the Civil Service Reform Act ("CSRA") of 1978, Pub. L. No. 95-454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.).  The CSRA "comprehensively overhauled the civil service system" and created an elaborate "new framework for evaluating adverse personnel actions against [federal employees]." *United States v. Fausto*, 484 U.S. 439, 443 (1988) (quoting *Lindahl v. OPM*, 470 U.S. 768, 773-74 (1985)).  Included in the CSRA framework are certain "prohibited personnel practices," one of which prohibits reprisal for whistleblowing activity[19] by federal employees and applicants.  5 U.S.C. § 2302(b)(8); *Weber v. United States*, 209 F.3d 756, 757-58 (D.C. Cir. 2000).  Employees who suspect reprisal for whistleblowing (or any other prohibited personnel practice) must report such allegations to the Office of Special Counsel ("OSC"), which investigates the matter.  5 U.S.C. § 1214(a)(1)(A); *Stella v. Mineta*, 284 F.3d 135, 142 (D.C. Cir. 2002).  If the OSC terminates an investigation or if it does not notify an employee within 120 days that it will take "corrective action," the employee can seek redress from the Merit Systems Protection Board ("MSPB").  5 U.S.C. §§ 1214(a)(3),

---

[19]     Such activity involves a disclosure of information that an employee or applicant reasonably believes shows "a violation of any law, rule, or regulation, or gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety."  5 U.S.C. § 2302(b)(8)(A)-(B).

1221(a); *Stella*, 284 F.3d at 142.  Finally, if the employee is "adversely affected or aggrieved" by

the MSPB's final decision, he or she can seek judicial review of that decision through the Federal

Circuit Court of Appeals.  5 U.S.C. §§ 1221(h)(1), 7703(b); *see also Roberts v. Dep't of Justice*,

366 F. Supp. 2d 13, 18 (D.D.C. 2005).

FBI employees, however, are specifically exempted from this general whistleblowing

protection scheme, 5 U.S.C. § 2302(a)(2)(C)(ii), and instead are subject to a separate

whistleblowing provision codified at § 2303.  5 U.S.C. § 2303; *see also Roberts*, 366 F. Supp. 2d

at 19 (noting that 5 U.S.C. § 2303 "provides a limited and specific protection to FBI agents who

are subject to employment-based reprisals for whistleblowing").  Just as under the general

scheme, § 2303 prohibits reprisals against FBI employees who disclose information they believe

shows, *inter alia*, "a substantial and specific danger to public health or safety," as the plaintiff

alleges here.  5 U.S.C. § 2303(a)(2).  Investigation of such reprisal allegations, however, and any

necessary corrective action is not subject to the OSC and MSPB procedures outlined in §§ 1214

and 1221, but instead is covered by DOJ-issued regulations.[20]  *See generally* 28 C.F.R pt. 27.

Under the regulations, FBI employees who have made protected disclosures and believe

that they have been retaliated against for doing so can report the alleged reprisal to the DOJ-IG or

the DOJ's Office of Professional Responsibility ("DOJ-OPR").  28 C.F.R. § 27.3(a)(1).  One of

the two offices then conducts an investigation into whether a reprisal for a protected disclosure

has occurred and is required to reach a determination within 240 days of receiving an employee's

---

[20]     Section 2303 instructs the Attorney General to issue regulations to ensure that
whistleblower reprisals prohibited in § 2303(a) "shall not be taken" against FBI
employees, 5 U.S.C. § 2303(b), and instructs the President to "provide for the
enforcement" of that prohibition, 5 U.S.C. § 2303(c).  President Clinton delegated this
enforcement task to the Attorney General.  *See* 62 Fed. Reg. 23123 (Apr. 14, 1997).

complaint.  28 C.F.R. §§ 27.3(a)(1)(b), 27.3(f).  If the DOJ-IG or DOJ-OPR decides to terminate

an investigation or has not notified the FBI employee who made the complaint within 120 days

that it will seek corrective action, the employee can request corrective action directly from the

Director of the DOJ's Office of Attorney Recruitment and Management ("DOJ-OARM").  28

C.F.R. § 27.4(c)(1).  After the OARM Director reaches a final determination, the employee can

request a review by the Deputy Attorney General.  28 C.F.R. § 27.5.

     The plaintiff argues that the court has subject matter jurisdiction over his whistleblower

claim because "the clear intent of 28 C.F.R. § 27 *et. seq.* is to waive sovereign immunity" and

that "it is a well[-]established principle of statutory construction that Congress will be presumed

to have intended judicial review of agency action unless there is a 'persuasive reason' to believe

otherwise."  Pl.'s Opp'n at 23, 25 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967)).

The court disagrees.  The DOJ's final rule implementing 5 U.S.C. § 2303 makes clear Congress'

intent to preclude judicial review of FBI whistleblowing investigations under 28 C.F.R. pt. 27.

*See generally* Whistleblower Prot. for FBI Employees, 64 Fed. Reg. 58782 (Nov. 1, 1999).  "One

fundamental difference" between whistleblowing reprisal remedies available to most federal

employees and those set forth by the DOJ for FBI employees is that "the procedures provided [to

FBI employees] are entirely internal to the [DOJ]."  *Id.* at 58783.  This is because 5 U.S.C. §

2303 identifies the Attorney General or his or her designee as recipients of protected disclosures,

"rather than any outside person or entity."  *Id.*  Also, the President's 1997 directive instructs the

Attorney General to "establish processes within the Department of Justice to carry out" § 2303's

mandates.  *Id.*; 62 Fed. Reg. 23123 (Apr. 14, 1997).  This directive is consistent with the statute's

legislative history, which indicates that Congress gave the president authority to set up a

whistleblower system in which appeals would "not be outside but to the Attorney General." *Id.* (quoting Cong. Rec. 28770 (1978)).  If Congress had wanted to provide FBI employees with avenues outside of the DOJ to pursue whistleblower reprisal claims, it could have included them in the OSC and MSPB procedures described above.  That Congress specifically excluded the FBI from those procedures strongly suggests that it did not want outside entities to address such claims.  Whistleblower Prot. for FBI Employees, 64 Fed. Reg. at 58,785-86.

Congress specifically rejected the suggestion of judicial review of decisions made under the implementing regulations because the source of authority for those regulations, 5 U.S.C. § 2303, "does not provide for judicial review, and Congress has therefore not waived sovereign immunity for this purpose."  Whistleblower Prot. for FBI Employees, 64 Fed. Reg. at 58,786.  Thus, the whistleblowing protection scheme for FBI employees under 28 C.F.R. pt. 27 "does not permit a complainant to seek judicial review or otherwise pursue a reprisal case through entities external to and independent of the DOJ." *Roberts*, 366 F. Supp. 2d at 20.  Therefore, the court does not have subject matter jurisdiction over the plaintiff's whistleblower claim.

The plaintiff further argues, however, that this court has jurisdiction over his whistleblower claim because the DOJ did not live up to its end of the bargain with respect to 28 C.F.R. pt. 27.  Pl.'s Opp'n at 23.  Specifically, the plaintiff argues that the DOJ ignored "the highly specific and detailed procedures and time limits imposed by 28 C.F.R. § 27.3"[21] after the plaintiff made his four complaints of whistleblower reprisal activity to the DOJ-IG.  *Id.*

---

[21]    The office designated to investigate a reprisal allegation must, *inter alia*, provide written notice to the complaining employee within fifteen days, provide a status update every sixty days, make its determination within 240 days, and notify the employee within ten days if it decides to terminate an investigation.  28 C.F.R. § 27.3(c)-(g).

Sovereign immunity was waived, he argues, by the whistleblower regulations that the plaintiff

"attempted to use and to which Defendants failed to adhere." *Id.* at 25.  Absent relief in court, he

argues, he would have no relief at all.  *Id.* at 24.

For an FBI employee so intimately familiar with applicable whistleblower regulations,

however, it is curious that the plaintiff does not see the relief available to him if, as he alleges, his

complaints to the DOJ-IG were ignored.  For, as previously noted, if 120 days has passed after an

FBI employee complains of whistleblowing reprisal to the DOJ-IG or DOJ-OPR, and the

employee has not been notified that corrective action will be taken, the employee can request

corrective action directly to the Director of DOJ-OARM.  28 C.F.R. § 27.4(c)(1).  The plaintiff,

however, has not alleged in his amended complaint that he took this step.  Instead, he simply

states that he "has exhausted his administrative remedies."  Am. Compl. ¶ 7.  This legal

conclusion simply cast in the form of a factual allegation is insufficient.  *See Kowal v. MCI

Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994).  FBI employees who allege that the DOJ failed

to fully investigate 5 U.S.C. § 2303 claims must allege that they actually followed the statutory

scheme available to them.  *See Roberts*, 366 F. Supp. 2d at 22 n.6 (noting that an FBI agent

complaining of an inadequate investigation did not allege that he ever submitted a complaint or

complained about reprisals to the proper authorities).  Here, the plaintiff alleges that his

complaints to DOJ-IG were ignored and that he "exhausted his administrative remedies," yet he

has not alleged that he pursued C.F.R. procedures specifically applicable to the situation he

describes.  Instead, he improperly seeks to pursue his reprisal case "through entities external to

and independent of the DOJ[,]" which 28 C.F.R. pt. 27 "does not permit."  *Id.* at 20 (citation

omitted).

Because WPA provisions for FBI employees do not provide for judicial review and because the plaintiff failed to exhaust his administrative remedies, the court grants the defendants' motion to dismiss the plaintiff's whistleblower claims for lack of subject matter jurisdiction.

### E.   Count VII: The First Amendment Claim

### 1.   The Plaintiff's Allegations

The plaintiff alleges, in a paragraph that would traumatize an English teacher,[22] that the defendants violated his right to free speech under the First Amendment to the U.S. Constitution by ordering him to stop raising the "safety issue" regarding his presence at Quantico.  Am. Compl. ¶ 87.  The plaintiff specifically contends that the defendants restricted his free speech rights and rendered "moot" the remedial measures available to him under the Whistleblower Protection Act by (1) refusing to investigate and resolve his "protected disclosures" regarding his safety concerns and the alleged retaliation he suffered for making those disclosures, (2) ordering him to stop addressing his safety concerns, and (3) disciplining him for addressing those concerns.  *Id.*

---

[22]   The paragraph, consisting of one sentence, reads: "Defendant Agency, including William Coggins in his official capacity as a supervisor, and Defendants Farrar, Bullock and Jordan in their official capacity as supervisors and also in their individual capacity, through their refusal to investigate and resolve Plaintiff's protected disclosures made pursuant to 5 U.S.C. § 2303 and 28 C.F.R. § 27.1 and 27.2, *et seq.*, regarding his safety concerns and also regarding retaliation against him for making protected disclosures, and by ordering him, under threat of discipline, to cease and desist from attempting to address these issues, and by disciplining him for addressing these issues, so violated the remedial scheme envisioned by 5 U.S.C. § 2303 and 28 C.F.R. § 27.1 and 27.2, *et seq.*, so as to render them moot, and also impermissibly restricted Plaintiff's speech, and thus Defendants' actions violated Plaintiff's free speech rights under the First Amendment of the Constitution of the United States."  Am. Compl. ¶ 87.

The plaintiff further alleges that when he spoke out about his safety concerns, he was speaking on a matter of public concern because he lives near Quantico (and therefore the "potential dangerous confrontation" he feared would erupt by his presence could injure bystanders in the area – not just FBI personnel). *Id.* ¶ 88. Also, he claims that his interest as a citizen in speaking out on an issue of public concern outweighed any interest the defendants had (such as promoting the efficiency of the public service) in preventing him from speaking out. *Id.* Finally, the plaintiff alleges that his speaking out was a "substantial or motivating factor in the adverse actions taken against him" by the defendants. *Id.*

**2.    The Court Grants the Defendants' Motion to Dismiss the First Amendment Claim**

A plaintiff is generally required to exhaust administrative claims when the CSRA provides a fully effective remedy. *Martin v. Envtl. Prot. Agency*, 271 F. Supp. 2d 38, 44 (D.D.C. 2002); *Roberts*, 366 F. Supp. 2d at 22. Even before the passage of the CSRA, courts in this circuit held that "when a constitutional claim is intertwined with a statutory one, and Congress has provided machinery for the resolution of the latter, a plaintiff must first pursue the administrative machinery." *Steadman v. Governor*, *U.S. Soldiers' and Airmen's Home*, 918 F. 2d 963, 967 (D.C. Cir. 1990) (citations omitted). In passing the CSRA, Congress created "an enormously complicated and subtle scheme to govern employee relations in the federal sector," and therefore, "federal employees may not circumvent that structure even if their claim is based as well on the Constitution." *Id*. (citation omitted). Giving district courts jurisdiction over constitutional claims when the CSRA provides a remedy "would simply put a premium on clever drafting of a complaint." *Id.*

Only in the "unusual case in which the constitutional claim raises issues totally unrelated

34

to the CSRA procedures" can a plaintiff bring a constitutional claim directly to district court.  *Id*. (citation omitted).  Here, the issue underlying the plaintiff's constitutional claim is inextricably related to a CSRA procedure: namely, FBI whistleblower regulations.[23]  The plaintiff himself states in his complaint that the defendants "violated the remedial scheme" envisioned by the FBI whistleblower regulations, rendering it "moot."  Am. Compl. ¶ 87.  Furthermore, the CSRA procedure would be "fully effective" in addressing his claim.  The plaintiff alleges that he was disciplined out of retaliation for making protected disclosures regarding his safety concerns and told to stop raising those concerns.  The WPA is specifically designed to address this type of allegation.  As aforementioned, under the WPA, an FBI employee who has made protected disclosures and believes that they have been retaliated against for doing so, can report the alleged reprisal to the DOJ-IG or the DOJ-OPR.  Then, if those offices are unresponsive or terminate the investigation, the FBI employee can bring the complaint to the DOJ-OARM and eventually the Deputy Attorney General.  If the complaint is upheld, the remedies available under the regulations are broad.  They include placing the employee in the position he would have been had the reprisal not taken place and reimbursing attorneys' fees, back pay, foreseeable consequential damages, and other costs.  28 C.F.R. § 27.4(f).

The only issue, therefore, is whether the plaintiff exhausted this available statutory remedy.  As the court previously stated, even if the plaintiff did achieve "whistleblower status," he has not alleged that he requested corrective action directly to the Director of DOJ-OARM

---

[23]     Both the Whistleblower Protection Act ("WPA") and the CSRA are scattered throughout Title 5 of the United States Code.  *Martin v. EPA*, 271 F. Supp. 2d 38, 44 n.3 (D.D.C. 2002).  For purposes of the exhaustion requirement, it makes no difference whether the available statutory remedy is derived from the CSRA or the WPA.  *Id.*

after the Office of the FBI Director allegedly ignored his "protected disclosure," as the regulations provide.  28 C.F.R. § 27.4(c)(1).  Because he has not availed himself of this option, nor appealed an adverse decision to the Deputy Attorney General, the plaintiff has not met his burden of establishing that the court has subject matter jurisdiction.  Even if the plaintiff believed that pursuing the whistleblower regulations to their fullest extent would be futile, he was still required to exhaust that remedy.  *Martin*, 271 F. Supp. 2d at 46.

The CSRA's preclusion and exhaustion requirements apply not only to the plaintiff's claim against the defendants in their official capacities, but against them as individuals as well.  While the Supreme Court has held that victims of constitutional violations on the part of federal officers acting under the color of their authority may bring suit for damages, such suits are allowed only when there are no "special factors counseling hesitation in the absence of affirmative action by Congress."  *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 396 (1971).  One such "special factor" cautioning courts against creating a *Bivens* remedy is when Congress has created  "comprehensive procedural and substantive provisions giving meaningful remedies against the United States."  *Polsdorfer v. Gearan*, 1996 WL 451051, at *2 (D.D.C. Aug. 1, 1996) (quoting *Bush v. Lucas*, 462 U.S. 367, 368 (1983)).  The CSRA, including its whistleblower procedures, is one such comprehensive statutory scheme.  *Polsdorfer*, 1996 WL 451051, at *3 n.9 ; *see also Mittleman v. U.S. Treasury*, 773 F. Supp. 442, 453 (D.D.C. 1991); *Maye v. Reno*, 231 F. Supp. 2d 332, 339 (D.D.C. 2002).  The CSRA, as aforementioned, provides the plaintiff with an appropriate remedy,[24] and the court cannot create a *Bivens* remedy

---

[24]     Even if the CSRA provided the plaintiff with "no remedy whatsoever," its preclusive effect would still apply.  *Spagnola v. Mathis*, 859 F.2d 223, 228 (D.C. Cir. 1988) (quoting *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988)).

against the defendants in their individual capacities.  Accordingly, the court grants the

defendants' motion to dismiss the plaintiff's First Amendment claim for failure to exhaust his

administrative remedies.

### F.    Count VIII: The Privacy Act and HIPAA Claims

### 1.    The Plaintiff's Allegations

In his final count, the plaintiff claims that the defendants[25] "willfully, intentionally,

maliciously, and unlawfully" violated the Privacy Act and the Health Insurance Portability and

Accountability Act ("HIPAA") by disclosing information about his past medical diagnoses of

depression and OCD.  Am. Compl. ¶ 93.  Specifically, he alleges that these violations occurred in

four ways.  First, he claims that the issuance of the Farrar Letter, which mentions that the results

of two psychological fitness-for-duty evaluations of the plaintiff resulted in diagnoses of major

depressive disorder and OCD, "served to inform Plaintiff's chain of command" about his

depression and OCD history.  Am. Compl. ¶ 93a; Defs.' Mot., Ex. 6.  Farrar contends that he

learned of this information as supervisor of the FBI's Health Care Programs Unit, and Section

Chief William Coggins, who assisted in drafting the letter, also learned of this information

through his oversight of that unit.  Am. Compl. ¶ 93a.  Second, the plaintiff alleges that in

November 2002, defendant Bullock informed the plaintiff's then-section chief, Keith Slotter,

about the past diagnoses.  Am. Compl. ¶ 93b.  According to the plaintiff, this information was

---

[25]    The defendants argue that the plaintiff has not named a federal agency as a defendant in
this case, as is required in civil actions for damages under the Privacy Act.  Defs.' Mot.
at 40.  Instead, only individuals – the attorney general, Farrar, Bullock and Jordan – are
named.  The plaintiff responds by pointing out that naming a government official in his
or her official capacity represents "another way of pleading an action against an entity of
which an officer is an agent."  Pl.'s Opp'n at 44 (quoting *Ky. v. Graham*, 473 U.S. 159
(1985).  The court agrees that the plaintiff properly named a federal agency, the Justice
Department, as required by the Privacy Act.  5 U.S.C. ¶ 552a(g)(1).

not pertinent to any performance issue at that time, nor was it required for Slotter to supervise the plaintiff.  *Id.*  Third, the plaintiff alleges that Singleton provided two FBI-OPR investigators "false and misleading information" regarding the plaintiff's psychological condition, despite her having access to the plaintiff's "complete records."  Am. Compl. ¶ 93c.  The plaintiff learned of the fourth and final alleged violation when he read defendant Bullock's December 8, 2003 sworn statement submitted as part of the plaintiff's third administrative charge.  Am. Compl. ¶ 93d.  In the statement, Bullock mentions that he reviewed communications concerning the plaintiff's fitness-for-duty evaluations showing that mental health officials concluded that he "has an obsessive-compulsive personality disorder."  Am. Compl. ¶ 93d; Defs.' Mot., Ex. 8.  The plaintiff claims that Bullock was likely able to access this information because he had oversight of the Health Care Programs Unit and that he had no need to review the plaintiff's medical records or reveal his diagnosis as part of an investigation into the plaintiff's discrimination charge.  Am. Compl. ¶ 93d.

### 2.  The Court Grants the Defendants' Motion to Dismiss the HIPAA Claim

"Congress enacted HIPAA [codified at 42 U.S.C. §§ 1320d to 1320d-8], in part, to address concerns about the confidentiality of health information[.]"  *Logan v. Dep't of Veterans Affairs*, 357 F. Supp. 2d 149, 155 (D.D.C. 2004).  The law, among other things, "imposes requirements on the Department of Health and Human Services ("HHS"), health plans, and health care providers involved in the exchange of health information."  *Id.*  Although HIPAA provides for civil and criminal penalties against those who improperly disclose an individual's health information, "the law specifically indicates that the Secretary of HHS shall pursue the action against an alleged offender, not a private individual."  *Id.* (dismissing HIPAA claim

involving testimony regarding federal employee's mental health because HIPAA provides no private right of action); *see also Johnson v. Quander*, 370 F. Supp. 2d 79, 99-101 (D.D.C. 2005) (dismissing HIPAA claim involving disclosure of DNA information because no private right of action exists under HIPAA). No federal court "has ever found that Congress intended HIPAA to create a private right of action." *Swift v. Lake Park High Sch. Dist.*, No. 03-C5003, 2003 WL 22388878, at *4 (D.C.Ill. Oct. 21, 2003) (quoted in *Dominic v. Wy. Valley W. High Sch.*, 362 F. Supp. 2d 560 (M.D. Pa. 2004)); *see also O'Donnell v. Blue Cross Blue Shield of Wy.*, 173 F.Supp. 2d 1176, 1179-80 (D. Wyo. 2001); *Univ. of Co. Hosp. Auth. v. Denver Pub. Co.*, 340 F. Supp. 2d 1142 (D. Colo. 2004).

The plaintiff argues that at least one federal court has held that there is a private right of action under HIPAA, citing and excerpting extensively from *Stang v. Clifton Gunderson Health Care Plan*, 71 F. Supp. 2d 926 (W.D. Wisc. 1999). The plaintiff, however, misreads *Stang*. *Stang* involved a father suing his health care provider for allegedly denying coverage for his son because his son suffered from a kidney disorder. *Id.* at 928. His suit was based on a HIPAA nondiscrimination provision that is codified as a provision of the Employee Retirement Income Security Act ("ERISA"). *Id.* at 932. The suit was brought under 29 U.S.C. § 1132(a), which allows a right of action for ERISA participants and beneficiaries to obtain relief for ERISA violations. Thus, he sued under ERISA to enjoin an alleged HIPAA violation, and the court never directly addressed whether HIPAA itself provides a private right of action. The crux of the plaintiff's arguments is that the legislative intent in passing HIPAA as a part of ERISA indicates that victims of HIPAA violations are entitled to a private right of action, just as victims of ERISA violations are. Thus, the plaintiff claims he has a private right of action under the ERISA

39

statute providing such a right, 29 U.S.C. § 1132.  Pl.'s Opp'n at 38-39.

Given the clear holdings by courts in this circuit as well as in others – in contrast to the

relative silence of *Stang* on the issue – the court concludes that there is no private right of action

under HIPAA of which the plaintiff can avail himself.  The plaintiff cannot bring a suit under 29

U.S.C. § 1132(a), because he does not allege to be an ERISA plan "participant, beneficiary, or

fiduciary."  29 U.S.C. § 1132(a).  Thus, insofar as his Count VIII claims allege violations of

HIPAA, the court dismisses them.

### 3.    The Court Denies the Defendants' Motion to Dismiss the Privacy Act Claim

The Privacy Act, codified at 5 U.S.C. § 552a, governs how federal agencies can disclose,

maintain, and provide access to records and information they are holding about specific

individuals within a "system of records."  The plaintiff brings his Privacy Act claim under the

provision prohibiting unauthorized disclosures of records.  Am. Compl. ¶ 91.  Section 552a(b)

provides that no agency shall disclose any record "by any means of communication to any person

. . . except pursuant to a written request by, or with the prior written consent of, the individual to

whom the record pertains."  To pursue a claim of improper disclosure under the Privacy Act, a

plaintiff must show that: "1) the disclosed information is a 'record' contained within a 'system of

records'; 2) the agency improperly disclosed the information; 3) the disclosure was willful or

intentional; and 4) the disclosure adversely affected the plaintiff."  *Logan*, 357 F. Supp. 2d at 154

(citing *Fisher v. Nat'l Institutes of Health*, 934 F. Supp. 464, 468 (D.D.C. 1996), *aff'd* 107 F.3d

922 (D.C. Cir. 1996)).  For disclosed information to be considered a "record" within the meaning

of the Privacy Act, the information must "be about an individual," and "contain the individual's

name or identifying particular."  *Logan*, 357 F. Supp. 2d at 154 (quoting *Tobey v. NLRB*, 40 F.3d

469, 471 (D.C. Cir. 1994)).

The defendants argue that one of the plaintiff's allegations, Singleton providing "false and misleading information" about the plaintiff's psychological condition to two FBI-OPR investigators, on its face cannot be a violation of the Privacy Act. The court agrees. The complaint states that Singleton made these disclosures despite having access to the plaintiff's "complete records." Am Compl. ¶ 93c. The clear inference is that she chose to spread false information rather than disclose presumably accurate information contained in the records kept by the agency. Thus, the plaintiff' own complaint alleges that information about him contained within the FBI's "system of records" was not disclosed without his permission. The allegation amounts only to an accusation of rumor-mongering; thus, the plaintiff has pled himself out of court as to this allegation.

The remaining three allegations, however, are a different story, and none of the defendants' arguments in support of their dismissal is convincing at this stage. Regarding the alleged disclosures involving the Farrar Letter and defendant Bullock's sworn statement, the defendants argue that "the undisputed facts in this case demonstrate that plaintiff voluntarily informed his chain of command about his medical history and diagnoses." Defs.' Mot at 41 (emphasis omitted). Further, the defendants argue that "the record" shows that the plaintiff provided to the EEOC investigator investigating his claims of discrimination "the same information he is accusing Defendant Bullock of improperly disclosing." *Id.* The problem with the defendants' arguments here, however, is that there is no "record" at this stage to support them. Instead, the defendants base their arguments on numerous attached exhibits that are not part of the pleadings. As mentioned *supra* in footnote 1, the court is not converting the

defendant's motion to dismiss into one for summary judgment and thus cannot consider materials outside of the pleadings, save for the six exhibits it determines are referred in and central to the plaintiff's amended complaint. The defendants do not rely on any of those six[26] to support their contention that the plaintiff voluntarily disclosed his mental health information. Therefore, the court cannot consider materials outside the pleadings to support that contention at this stage.[27]

The defendants also argue that the plaintiff has not alleged that his medical and mental health histories are a "record" part of a "system of records" that is "maintained by" the FBI, as required by the Privacy Act. Defs.' Mot at 45-46. This argument fails as well. A "record," in relevant part, means "any item, collection or grouping of information about an individual . . .

---

[26]    The defendants reference the Farrar Letter, which is referred to in the plaintiff's amended complaint and central to the plaintiff's claim. *See supra* note 1. The letter states that it is being written "in reply to the package of material" that the plaintiff sent Assistant Director Grant Ashley, which Ashley then sent to Farrar to evaluate. Defs.' Mot. at 41-42, Ex. 6. The defendants then attach and cite to that package of material, which includes several memoranda that the plaintiff had written. *Id.* at 42. Because the plaintiff does not reference this material in his amended complaint, however, the court does not consider it in ruling on the defendants' motion to dismiss.

[27]    Even if the court could consider such arguments, it is not clear how they support the defendants' motion to dismiss because the defendants do not cite to authority indicating that an individual's voluntary disclosure of information precludes his or her ability to succeed in a Privacy Act claim. The defendants do cite to authority to support an argument along similar lines: that "when a release consists merely of information to which . . . the recipient of the release already knows, the Privacy Act is not violated." *Id.* at 46 (quoting *Hollis v. Dep't of the Army*, 856 F. 2d 1541, 1545 (D.C. Cir. 1988). The defendants argue, by virtue of the plaintiff's alleged voluntary disclosures, that the FBI personnel who became aware of the contents of the Farrar Letter and defendant Bullock's sworn statement already knew about the plaintiff's mental health diagnoses, and thus there were no "disclosures." Defs.' Mot at 46. As the defendants concede, however, the D.C. Circuit limited *Hollis* to its facts in *Pilon v. Dep't of Just.*, 73 F.3d 1111 (D.C. Cir. 1996). Defs.' Mot. at 46. *Pilon* holds that the term "disclose" applies in virtually all instances of an agency's unauthorized transmission of a protected record, "regardless of the recipient's prior familiarity with it." *Pilon*, 73 F.3d at 1124. Therefore, the defendants' argument regarding any prior knowledge possessed by FBI employees who read the Farrar Letter or defendant Bullock's sworn statement fails.

including . . . medical history." 5 U.S.C. § 552a(a)(4). A "system of records" means "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some . . . identifying particular." 5 U.S.C. § 552a(a)(5). "Maintain" means "maintain, collect, use, or disseminate." 5 U.S.C. § 552a(a)(3). The plaintiff has alleged enough in his amended complaint for the court to infer that these statutory terms are implicated. *M.K. v. Tenet*, 99 F. Supp. 2d 12, 24 (D.D.C. 2000) (stating that in order to state a Privacy Act claim and survive a 12(b)(6) motion to dismiss, a complaint can contain either "direct or *inferential* allegations sufficient to state all elements of a cause of action") (emphasis in original). The court can infer that where the Farrar Letter refers to the results of psychological fitness-for-duty examinations of the plaintiff, those results and examinations are, as defined in the Privacy Act, "records" within a "system of records" that is "maintained" by the FBI. Similarly, where defendant Bullock's sworn statement indicates he reviewed "communications" concerning those examinations, those communications also fall within the terms statute. Also, where defendant Bullock is alleged to have access to the plaintiff's medical information and to have disclosed the plaintiff's medical diagnoses to a colleague without justification, the Privacy Act is implicated. To the extent that the plaintiff is vague about the specific "records" he alleges were disclosed or whether they were part of a "system of records," there "will come a time" for him to be more specific, but "that point surely [is] not as early as the pleading stage." *Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000).

Finally, regarding defendant Bullock's sworn statement, the defendants argue that the statement falls within the "routine use" disclosure exceptions listed at 5 U.S.C. § 522a(b)(3). Defs.' Mot. at 4. The specific "blanket routine use" exception that the defendants point to allows

43

disclosures to "a court or adjudicative body, in matters in which the FBI or any FBI employee in his or her official capacity . . . is or could be a party to the litigation, is likely to be affected by the litigation, or has an official interest in the litigation, and disclosure of system records has been determined by the FBI to be arguably relevant to the litigation."  Privacy Act of 1974; System of Records, 66 Fed. Reg. 33,558, 33,560 (June 22, 2001).  The court is sympathetic to the defendants' contention that the plaintiff "cannot file claim after claim alleging unlawful discrimination, and then attempt to hold the Agency liable under the Privacy Act for investigating those claims through the administrative process."  Defs.' Mot. at 47.  The court, however, is not convinced that dismissal of the allegation regarding defendant Bullock's sworn statement is appropriate, based on the "Courts or Adjudicative Bodies" routine use exception the defendants rely on.  First, it is not at all clear that an agency's investigation into an employee's administrative charge involves an "adjudicative body" or can be considered "litigation."  Second, the plaintiff alleges that Bullock "had no need to review" his medical records to resolve his Quantico safety concerns or to discuss his medical history as part of an investigation into the plaintiff's discrimination charge.  The court takes this allegation as true for the purposes of this Rule 12(b)(6) motion.  The court concludes that whether the routine use exception the defendants raise here or whether any other Privacy Act exception applies should be decided after the parties have had an opportunity to complete discovery.

## IV.   CONCLUSION

For the foregoing reasons, the court grants the defendants' motion to dismiss for failure to state a claim as to Counts I-IV, in which the plaintiff alleges sex and reprisal discrimination in

violation of Title VII of the Civil Rights Act of 1964.  The court also grants the defendants'

motion to dismiss for lack of subject matter jurisdiction as to Count VI, in which the plaintiff

alleges a violation of the Whistleblower Protection Act; Count VII, in which he alleges a

violation of his First Amendment right to free speech; and to the portion of Count VIII alleging a

violation of the Health Insurance Portability and Accountability Act.  The court denies the

defendants' motion to dismiss for failure to state a claim as to Count V, in which the plaintiff

alleges he endured a hostile work environment in violation of Title VII, and as to the portion of

Count VIII alleging a violation of the Privacy Act.  An order consistent with this Memorandum

Opinion is separately and contemporaneously issued this 28th day of September 2005.


RICARDO M. URBINA
United States District Judge